**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1733**

ROBERT SANCHEZ TURNER,

Plaintiff - Appellant,

v.

AL THOMAS, JR., in his individual capacity and his official capacity as Chief of Charlottesville Police Department; CITY OF CHARLOTTESVILLE, VIRGINIA; W. STEVEN FLAHERTY, in his individual capacity,

Defendants - Appellees.

Appeal from the United States District Court for the Western District of Virginia, at Charlottesville. Norman K. Moon, Senior, District Judge. (3:17-cv-00064-NKM-JCH)

Argued: March 21, 2019        Decided: July 19, 2019

Before FLOYD, HARRIS, and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Floyd wrote the opinion in which Judge Harris and Judge Richardson joined.

**ARGUED:** Dallas S. LePierre, NEXUS DERECHOS HUMANOS ATTORNEYS, INC., Atlanta, Georgia, for Appellant. Michelle Shane Kallen, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia; David Patrick Corrigan, HARMAN CLAYTOR CORRIGAN & WELLMAN, P.C., Glen Allen, Virginia; Richard Hustis Milnor, ZUNKA, MILNOR & CARTER LTD, Charlottesville, Virginia, for Appellees. **ON BRIEF:** Mario B. Williams, NEXUS DERECHOS HUMANOS

ATTORNEYS, INC., Atlanta, Georgia, for Appellants. Mark R. Herring, Attorney General, Samuel T. Towell, Deputy Attorney General, Erin McNeill, Assistant Attorney General, Toby J. Heytens, Solicitor General, Matthew R. McGuire, Principal Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee W. Steven Flaherty. Jeremy D. Capps, Douglas E. Pittman, HARMAN CLAYTOR CORRIGAN & WELLMAN, P.C., Glen Allen, Virginia, for Appellee Al Thomas, Jr.

———————

FLOYD, Circuit Judge:

Appellant Robert Sanchez Turner was attacked by protesters at the "Unite the Right" rally on August 12, 2017 in Charlottesville, Virginia. Turner claims that, pursuant to a stand-down order under which police officers at the rally were instructed not to intervene in violence among protesters, officers watched his attack and did nothing to help. Turner brought suit against Al Thomas Jr., former Chief of the Charlottesville Police Department; W. Stephen Flaherty, Virginia State Police Superintendent; and the City of Charlottesville. The district court concluded that Thomas and Flaherty were entitled to qualified immunity and dismissed Turner's complaint for failure to state a claim. We agree with the district court that the facts alleged in Turner's complaint do not amount to a violation of clearly established law. Accordingly, we affirm.

## I.

Because Turner's claim was dismissed on the pleadings, we take as true all well-pleaded allegations in the complaint. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). On August 12, 2017, the "Unite the Right" rally was held in Charlottesville's Emancipation Park to protest the City's decision to change the Park's name from "Lee Park" and remove a Confederate monument from its grounds. Jason Kessler, leader of the far-right advocacy group "Unity & Security for America," led efforts to organize the rally.

The City granted Kessler a permit to hold the rally and informed him that heavy police presence and security would be provided. But less than a week before the event,

citing traffic and safety concerns, the City revoked the permit. Kessler challenged the revocation in the Western District of Virginia on First and Fourteenth Amendment grounds, and the district court reinstated the permit. According to Turner, Thomas and Flaherty were "enraged" by the decision to reinstate the permit. J.A. 24. In response, they enacted a stand-down order under which officers on duty at the rally would "refrain from intervening in any violent confrontations between white supremacists and counter-protesters unless given a direct command to do so." J.A. 25. Turner alleges that officers told protesters at the rally about the stand-down order. For example, when demonstrators asked if police planned to respond to violent attacks, at least one officer responded by saying "that's not my job." J.A. 26.

Turner attended the rally as a counter-protester. He alleges that while he demonstrated peacefully on the sidewalk adjacent to the Park, "KKK members/sympathizers" exited the Park and began to engage with counter-protesters. J.A. 27–28. According to Turner, the "KKK members/sympathizers" attacked him for more than thirty seconds, spraying his eyes with mace, beating him with a stick, and throwing bottles of urine at him, all while police looked on and did nothing. J.A. 26. Turner alleges that despite a warning from the Department of Homeland Security that the rally could turn violent, police did not wear riot gear to patrol the rally. Approximately five hours after the rally began, officers changed into riot gear and began to clear the Park, though at that point Turner had already been attacked.

Turner brought suit under 42 U.S.C. § 1983. In relevant part, Turner sought to hold Thomas and Flaherty directly liable for violation of his substantive due process

4

rights based on the police department's failure to protect him from violent protesters at the rally.[1]

## II.

We review de novo a dismissal under Federal Rule of Civil Procedure 12(b)(6), accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiff. *See Nemet Chevrolet,* 591 F.3d at 253. However, we "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (internal quotation marks omitted). The complaint must provide "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[1] Additionally, Turner's complaint sought to hold Thomas and Flaherty liable under a theory of supervisory liability and the City of Charlottesville liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). We need not address the supervisory-liability claim separately, because Turner has not argued that the qualified-immunity analysis should proceed any differently for that claim. We also find that Turner has waived his claim against the City of Charlottesville. At a hearing before the district court, Turner said he had "dropped" this claim. J.A. 178. Then, in his opening brief on appeal, Turner appeared to focus entirely on the qualified-immunity issue, which does not apply to the City. In response, the City argued that this claim had been waived; Turner declined to address the waiver argument in his reply, which did not even mention his claim against City. It was not until oral argument that Turner sought to preserve this claim. We conclude that Turner's inattention to this claim on appeal, combined with his express statement to the district court, effectively waived it. Therefore, we do not address it.

III.

Before us is Turner's claim that Thomas and Flaherty violated his substantive due process rights by ordering officers at the rally not to intervene in violence among protesters. In general, a defendant's mere failure to act does not give rise to liability for a due process violation. *See DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 196 (1989). Turner seeks to avoid that rule by invoking the state-created danger exception, under which state actors may be liable for failing to protect injured parties from dangers which the state actors either created or enhanced. *See Pinder v. Johnson*, 54 F.3d 1169, 1176 (4th Cir. 1995). But it was not clearly established at the time of the rally that failing to intervene in violence among the protesters would violate any particular protester's due process rights. Accordingly, we agree with the district court that Thomas and Flaherty are entitled to qualified immunity, and we affirm the dismissal of Turner's complaint.

Qualified immunity shields state actors from liability under § 1983 liability when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 US. 800, 818 (1982)). To determine whether a defendant is entitled to qualified immunity, we ask two questions: (1) Has the plaintiff alleged a violation of a federal right? (2) Was the right at issue clearly established at the time of the alleged violation? *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We may decide, on a case-by-case basis, which question to answer first. *Id.* If the answer to either question is "no," then the defendant is entitled to qualified immunity.

6

In this case, we begin by asking whether the right asserted by Turner was clearly established at the time of its alleged violation. To determine whether a right was clearly established, we typically ask whether, when the defendant violated the right, there existed either controlling authority—such as a published opinion of this Court—or a "robust consensus of persuasive authority," *Booker v. S.C. Dept of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017) (internal quotation marks omitted), that would have given the defendants "fair warning that their conduct was wrongful." *Williamson v. Stirling*, 912 F.3d 154, 187 (4th Cir. 2018) (internal quotation marks omitted). Thus, we must determine whether, at the time of the rally, there existed legal authority giving Thomas and Flaherty fair warning that ordering officers not to intervene in violence among protesters would implicate the state-created danger doctrine and amount to a violation of protesters' due process rights.

As our starting point, we turn to *DeShaney v. Winnebago County*, 489 U.S. at 196. There, the Supreme Court stated that because the Fourteenth Amendment was intended to protect "the people from the State, not to ensure that the State protected them from each other . . . [a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 196–97. Given that "the Due Process Clause does not require the State to provide its citizens with particular protective services," wrote the Court, "it follows that the State cannot be held liable for injuries that could have been averted had it chosen to provide them." *Id.* at 196–97.

There are two exceptions to the rule laid out in *DeShaney*. The first arises when the individual and the state have a "special relationship," such as a custodial relationship,

that gives rise to an affirmative duty to protect. *See id.* at 199–200 ("It is the State's affirmative act of restraining the individual's freedom to act on his own behalf . . . which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means."). Turner does not claim that the "special relationship" exception applies in this case.

The second, which *DeShaney* implicitly recognized and which Turner relies upon here, is known as the state-created danger doctrine. *See id.* at 201 ("While the State may have been aware of the dangers that [the child] faced . . . it played no part in their creation, nor did it do anything to render him any more vulnerable to them."). Under this doctrine, a state actor may be held liable for harm resulting from "affirmative actions" that created or enhanced the dangerous conditions that produced the plaintiff's injury. *See Pinder*, 54 F.3d at 1176. "[T]o establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omissions." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015). "Put another way, 'state actors may not disclaim liability when they themselves throw others to the lions,' but that does not 'entitle persons who rely on promises of aid to some greater degree of protection from lions at large.'" *Id.* (quoting *Pinder*, 54 F.3d at 1177).

As we recognized in *Pinder*, the state-created danger doctrine is narrowly drawn, and the bar for what constitutes an "affirmative act" is high. 54 F.3d at 1175. In that case, plaintiff Pinder called the police on her former boyfriend, Pittman, who had broken into her home, assaulted her, and threatened to kill her and her three children. *Id.* at

8

1172. After Pittman was arrested, Pinder asked the investigating officer if it would be safe for her to return to work that evening and leave her children at home. *Id.* The officer assured her that Pittman would be detained overnight on assault charges and could not be released until the county commissioner became available for a hearing the following morning. *Id.* However, instead of the assault charge, the officer filed lesser charges against Pittman, and he was released from custody that night. *Id.* Pittman then returned to Pinder's home after she left for work and set fire to it, killing her three children who were sleeping inside. *Id.*

Pinder brought a due process claim against the officer who had assured her that Pittman would be detained overnight, seeking to invoke the state-created danger doctrine. *Id.* at 1175. We rejected this application of the doctrine, however, holding that the officer did not *create* the danger that resulted in the children's death, but "simply failed to provide adequate protection from it." *Id.* "It cannot be," we noted, "that the state 'commits an affirmative act' or 'creates a danger' every time it does anything that makes injury at the hands of a third party more likely." *Id.* (internal quotation marks omitted). We acknowledged that "[a]t some point on the spectrum between action and inaction, the state's conduct may implicate it in the harm caused," but we concluded that "no such point [was] reached" in Pinder's case. *Id.*; *see also id.* at 1176 n.* (observing that although "inaction can often be artfully recharacterized as 'action,' courts should resist the temptation to inject this alternate framework into omission cases by stretching the concept of 'affirmative acts' beyond the context of immediate interactions between the officer and the [victim]").

9

Following *Pinder*'s narrow reading of the state-created danger doctrine, we have never issued a published opinion recognizing a successful state-created danger claim. Rather, our precedent on the issue has emphasized the doctrine's limited reach and the exactingness of the affirmative-conduct standard. For instance, in *Doe v. Rosa*, we held that the state-created danger doctrine did not apply when a college president, Rosa, failed to intervene after learning that a counselor at the college's summer camp sexually abused campers for several years. 795 F.3d at 431. One of the counselor's victims and the victim's family (the "Does") brought suit, claiming that Rosa not only failed to report the abuse, but also actively took steps to conceal it. *Id.* For example, the Does alleged that Rosa omitted abuse allegations from relevant records and purposefully obfuscated the nature of the Does' complaint to college officials. *Id.* at 434–35. We held that the Does' claims did not describe the "affirmative actions" necessary to implicate the state-created danger doctrine. *Id.* at 441 ("No amount of semantics can disguise the fact that the real 'affirmative act' here was committed by [the counselor] not by Rosa."). We noted that the Does' claims "lack[ed] the nexus necessary for any of Rosa's alleged conduct to be 'affirmative acts'" that created or enhanced the danger to the Does, specifically, because Rosa "did not meet or speak with the Does, and by all accounts, was not even aware [they] existed." *Id.*

Against this background, we conclude that it was not clearly established at the time of the rally that ordering officers *not* to intervene in private violence between protesters was an affirmative act within the meaning of the state-created danger doctrine. Our precedent sets an exactingly high bar for what constitutes affirmative conduct

10

sufficient to invoke the state-created danger doctrine. Turner has put forth no facts suggesting that a stand-down order crosses the line from inaction to action when the state conduct in *Pinder* and *Doe* did not. Acting under *Pinder*'s teaching that state actors may not be held liable for "st[anding] by and d[oing] nothing when suspicious circumstances dictated a more active role for them," Thomas and Flaherty could have reasonably concluded that a stand-down order violated no constitutional right. 54 F.3d at 1175. Accordingly, Turner has not alleged a violation of clearly established law, and Thomas and Flaherty are entitled to qualified immunity.[2]

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

[2] Turner argues that in assessing the merits of his substantive due process claim, we should ask whether Thomas and Flaherty acted with deliberate indifference to Turner's safety. But as we have stated, "apart from situations involving custody, the Supreme Court has never applied a 'deliberate indifference' standard merely because the State created a danger that resulted in harm." *Slaughter v. Mayor & City Council of Baltimore*, 682 F.3d 317, 321 (4th Cir. 2013); *see also Waybright*, 528 F.3d 199, 205 (4th Cir. 2008) ("For a due process challenge to executive action to succeed, the general rule is that the action must have been 'intended to injure in some way unjustifiable by the government interest.'"). Because there was no clearly established law imposing liability based on deliberate indifference in this context, qualified immunity shields Thomas and Flaherty from such liability.