**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-2334**

JONATHAN F. STARBUCK,

Plaintiff – Appellant,

v.

WILLIAMSBURG JAMES CITY COUNTY SCHOOL BOARD,

Defendant – Appellee.

Appeal from the United States District Court for the Eastern District of Virginia at Newport News. Mark S. Davis, Chief District Judge. (4:18-cv-00063-MSD-DEM)

Argued: January 27, 2022                           Decided: March 15, 2022

Before GREGORY, Chief Judge, and MOTZ and WYNN, Circuit Judges.

Affirmed in part and reversed in part by published opinion. Judge Motz wrote the opinion, in which Chief Judge Gregory and Judge Wynn joined.

**ARGUED:** Benjamin Lerman, Jacob Larson, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Jeremy David Capps, HARMAN CLAYTOR CORRIGAN & WELLMAN, Glen Allen, Virginia, for Appellee. **ON BRIEF:** J. Scott Ballenger, Gregory Eng, Third Year Law Student, Appellate Litigation Clinic, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Blaire H. O'Brien, HARMAN CLAYTON CORRIGAN & WELLMAN, Glen Allen, Virginia, for Appellee.

DIANA GRIBBON MOTZ, Circuit Judge:

Jonathan Starbuck brought this 42 U.S.C. § 1983 action against the Williamsburg James City County School Board (the "School Board") asserting that his public high school suspended him in violation of the First, Fifth, and Fourteenth Amendments. The district court held that *Monell v. Department of Social Services*, 436 U.S. 658 (1978), barred the suit and so dismissed Starbuck's complaint for failure to state a claim on which relief could be granted. Because the School Board acted as the final policymaking authority in approving Starbuck's suspension, *Monell* does not bar the suit. Moreover, Starbuck's complaint plausibly alleges a First Amendment claim. Accordingly, we must reverse those portions of the district court's judgment holding to the contrary. But the district court properly held that the complaint alleges no plausible Fifth or Fourteenth Amendment claim, and so we affirm that portion of its judgment.

I.

On February 15, 2018, the day after the horrific mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, Jonathan Starbuck engaged in a conversation with his classmates about the shooting. Starbuck alleges that "[n]o student within the conversation made any threat" and that the conversation was factual.[1] Starbuck "made remarks questioning the intent of the shooter, stating that the shooter would be capable of more harm had he wanted to, noting [the shooter's] possession of explosives and considering the time the shooter was left alone within the building unchallenged by local

---

[1] Because the district court dismissed this case on a Rule 12(b)(6) motion, we relate the facts as set forth in Starbuck's amended complaint.

law enforcement." A teacher overheard the conversation and reported it to the local police and school administration.

As a result, the school removed Starbuck from classes for the remainder of the school day. During that time, which Starbuck refers to as an "in-school suspension," he alleges that various school officials "interrogat[ed]" him. The "[s]chool [p]olice officer . . . investigated and cleared the [teacher's] report as unfounded" because the officer concluded "there was no threat made and no criminal offense . . . occurred."

That evening, an assistant principal informed Starbuck's parent that Starbuck faced a two-day out-of-school suspension. Starbuck maintains that concerns for his "own safety" constituted the reason given for the in-school suspension, and unspecified "[t]hreats" constituted the reason given for the out-of-school suspension. The following week, Starbuck, along with his brother and mother, attended a meeting with various school officials including the assistant principal and a representative from the School Board.

Following this meeting and after receiving a formal notice of the out-of-school suspension, Starbuck submitted a written notice of appeal to the School Board. Three months later, in May 2018, after considering Starbuck's arguments, the School Board "found the suspension was proper" stating the reason for the suspension as "[c]lassroom [d]isturbance."

In Starbuck's pro se amended complaint, he asserts claims against the School Board pursuant to 42 U.S.C. § 1983. He alleges that the School Board violated his right to free speech under the First Amendment and his due process rights under the Fifth and Fourteenth Amendments. The district court granted the School Board's motion to dismiss

3

due to a purported lack of an identifiable "policy" sufficient to give rise to liability under *Monell*. Starbuck then filed this appeal, principally arguing that the district court erred in determining that only express preexisting policies could give rise to the School Board's liability under *Monell*.[2]

We review a district court's dismissal of a complaint for failure to state a claim *de novo*. In conducting this review, we "accept the complaint's factual allegations as true and draw all reasonable inferences in favor of the plaintiff[]." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 685 (4th Cir. 2018). We must "liberally construe[]" pro se complaints, "however inartfully pleaded." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

II.

A.

For the purpose of determining liability under *Monell*, local school boards in Virginia are treated as municipalities. *See Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518, 522 n.3 (4th Cir. 2000). *Monell* permits suits against a municipality for a federal constitutional deprivation only when the municipality undertook the allegedly unconstitutional action pursuant to an "official policy" or "custom." 436 U.S. at 690–91.

---

[2] Our thanks to the student participants in the University of Virginia Appellate Litigation Clinic, under the leadership of Professor J. Scott Ballenger, who have provided Starbuck excellent representation on appeal.

The district court held that *Monell* limited municipal liability to occasions when the municipality's express policy allegedly violated a constitutional right. Although that may be the most common basis for liability under *Monell*, it is not the only one. Rather,

> [a] policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (alteration in original) (quoting *Carter v. Morris*, 164 F.3d 215, 217–18 (4th Cir. 1999) (first citing *Monell*, 436 U.S. at 690; then citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986); then citing *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989); and then quoting *Monell*, 436 U.S. at 691)); *see also Los Angeles Cnty., v. Humphries*, 562 U.S. 29, 36 (2010).

In *Monell* itself, the Supreme Court explained that "[l]ocal governing bodies . . . can be sued directly under § 1983 . . . where . . . the action that is alleged to be unconstitutional implements or executes a . . . decision officially adopted and promulgated by that body's officers." 436 U.S. at 690 (footnote omitted). Even "a single decision taken by the highest officials responsible for setting policy in that area of the government's business" can render a municipality subject to suit under *Monell*. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988); *see also Pembaur*, 475 U.S. at 481 ("[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.").

"[W]hether a particular official has final policymaking authority is a question of state law." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (cleaned up). "Virginia vests control of the public school system in the local school boards" and therefore, "the [School] Board retain[s] the final 'say-so'" over student suspensions, including short-term suspensions. *Riddick*, 238 F.3d at 523–24.[3] Thus, under Virginia law, the School Board has final policymaking authority over short-term suspensions. This means that the School Board's actions regarding student suspensions can serve as "policies" for the purpose of municipal liability under *Monell*.

Moreover, when a final policymaker has the authority to review the decision of a subordinate, its approval of that allegedly unconstitutional decision can also give rise to liability under Section 1983. *See Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 196 (4th Cir. 1994) (quoting *Praprotnik*, 485 U.S. at 127). Under this theory of liability, if the School Board ratified the suspension of a student by subordinates, the School Board would be liable for any deprivation of constitutional rights caused by that suspension.

Imposing liability on a municipality for its ratification of the acts of subordinates accords with the purpose of municipal liability under Section 1983. That is, it holds municipalities accountable for the "action[s] for which the municipality is actually

---

[3] In Virginia, short-term suspensions are appealable to the School Board unless School Board regulations provide to the contrary. Va. Code Ann. § 22.1-277.04. They do not do so here. In *Riddick*, we held that the School Board had not delegated final policymaking authority over employment decisions to the superintendent or other school officials. Rather, "all final personnel decisions in the . . . school system . . . are subject to final review by the Board." 238 F.3d at 523 (emphasis omitted). For this reason, in *Riddick*, as here, it was the decisions of the School Board (not those of the superintendent or the principal) that could serve as a proper source of *Monell* liability. *Id* at 523–24.

6

responsible." *Riddick*, 238 F.3d at 523 (quoting *Pembaur*, 475 U.S. at 479); *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) ("[T]he Board is only liable for acts that it has 'officially sanctioned or ordered.'" (quoting *Pembaur*, 475 U.S. at 480)).

Thus, ratification liability critically differs from respondeat superior liability, the latter of which is impermissible under *Monell*. *See Jett*, 491 U.S. at 736. Ratification liability does not hold a municipality liable for the actions of subordinate officials; rather, it holds the municipality liable for *its own decision* to uphold the actions of subordinates.

With these principles in mind, we turn to their application to the facts of the case at hand.

B.

The School Board concedes, as it must, that an affirmative decision by a final policymaker can serve as a "policy" under *Monell*. Br. of Appellee at 12. But the Board asserts three arguments in support of its view that *Monell* bars Starbuck's claim against the School Board.

First, the Board contends that Starbuck failed to raise this theory of municipal liability in his complaint and that he cannot do so for the first time on appeal. *Id*. at 10–11. But we "must not dismiss [a civil rights] complaint, unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (emphasis, internal quotation marks, and citation omitted); *see also Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 540 n.4 (4th Cir. 2017) (explaining that we "liberally construe[] complaints even where pro se plaintiffs do not reference any source of law").

7

Examination of Starbuck's pro se complaint reveals that he sufficiently set forth the facts that provided the basis for the legal theory he asserts against the School Board. *See* Am. Compl. ¶ 1 ("The School suspended Jonathan with approval from the School Board."); *id.* ¶ 28 ("When the Defendant [School Board] responded to the written appeal in May of 2018, the Defendant[] [School Board] found the suspension was proper. . . .").

Second, the School Board argues that Starbuck cannot rely on the Board's ratification of subordinate officials' conduct to hold the Board liable here because the Board "did not simply 'ratify' the actions of the school employees who suspended" him, rather the School Board's decision to approve the suspension "was the independent act of a policymaker." Br. of Appellee at 13. This argument gains the Board nothing because just as ratification of subordinate officials' actions is one means of holding a final policymaker liable under *Monell*, the independent act of the final policymaker provides another. *See Hall*, 31 F.3d at 196 (holding that the Board's ratification of a subordinate's unconstitutional actions as well as its own independent decision to fire Hall were both reasons "the District [could] be held liable for the act of the Board in dismissing Hall."). If, as the School Board seems to contend, the Board did not ratify the subordinate school officials' conduct but acted independently, then this independent act was still that of the final policymaking authority. Whether it ratified the suspension or independently imposed it, the Board's act was sufficient to hold the School Board liable for constitutional violations resulting from that act.

The School Board's third argument, that its act ratifying Starbuck's suspension does not constitute "the moving force" behind the constitutional violation, fares no better. Br.

8

of Appellee at 14. Starbuck has sufficiently alleged that the School Board's approval was in fact the "moving force" behind the constitutional violation. *Riddick*, 238 F.3d at 524 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). Contrary to the School Board's argument, being the "moving force" does not necessitate that a plaintiff allege that the Board have knowledge of, or involvement in, the alleged constitutional violation from the outset. *See* Br. of Appellee at 14–15. Of course, sometimes officials with final policymaking authority participate in the initial constitutional violation perpetrated by subordinates. *See, e.g.*, *Pembaur*, 475 U.S. at 473; *Hall*, 31 F.3d at 196. But the entire concept of ratification liability presupposes that the initial complained-of conduct precedes involvement by the final policymaking authority. Accordingly, neither the Supreme Court nor this Court has ever held that initial involvement is required to hold officials with final policymaking authority liable as the "moving force" for ratification of the decisions of subordinates.[4]

---

[4] Moreover, contrary to the Board's suggestion, the final policymaker's potential liability does not hinge upon whether it had contemporary knowledge of subordinates' allegedly unconstitutional decision. While contemporary knowledge of the initial constitutional violation may support holding a final policymaker liable under *Monell*, it is not necessary. *See Hall*, 31 F.3d at 196. A municipality can be held liable under the ratification theory regardless of any contemporary knowledge or active participation in the initial unconstitutional actions of subordinate officials. *See Praprotnik*, 485 U.S. at 127 (explaining what municipal liability based on ratification requires with no suggestion that contemporary knowledge is necessary — "when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.").

Here it is clear that the School Board's act did constitute the moving force behind the asserted constitutional violation — the alleged punishment of protected speech. For Starbuck alleges that only because the School Board upheld the suspension does it remain on his permanent record. This is a result that, as the Supreme Court has recognized, "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Goss v. Lopez*, 419 U.S. 565, 575 (1975). Accordingly, because Starbuck alleges facts supporting his contention that the School Board ratified his suspension for uttering protected speech, the Schools Board's action was indeed the "moving force" behind the constitutional violation, just as Starbuck alleged in his complaint. *See* Am. Compl. ¶¶ 34, 39.[5]

The School Board's approval of a suspension allegedly imposed to punish assertedly protected speech is a decision of a body with final policymaking authority. *Monell* teaches that such a decision gives rise to the School Board's potential liability under 42 U.S.C. § 1983.

III.

We turn to the sufficiency of Starbuck's allegations of constitutional violations.

---

[5] At oral argument, counsel for the School Board conceded that only the School Board (or its representative) could remove the suspension from Starbuck's permanent record. Oral Argument at 19:57, *Starbuck v. Williamsburg James City Cnty. Sch. Bd.* (4th Cir. Jan. 27, 2022) (No. 20-2334), https://www.ca4.uscourts.gov/OAarchive/mp3/20-2334-20220127.mp3. In doing so, counsel acknowledged that the alleged ongoing constitutional violation lies entirely within the School Board's prerogative to remedy.

A.

In interpreting the First Amendment, the Supreme Court has long held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Student speech falls within the protection of the First Amendment unless it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others," *id*. at 513, or (at least as applied to on-campus speech) is "indecent," "lewd," or "vulgar," "promotes illegal drug use," or is communicated through a school-sponsored activity, *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2045 (2021) (internal quotation marks and citations omitted). Starbuck's speech does not fall within any of these categories.

According to his complaint, Starbuck only engaged in a factual conversation with his peers about a current event that is uniquely salient to the lives of American teenagers, a school shooting. Schools cannot silence such student speech on the basis that it communicates controversial or upsetting ideas. To do so would be incompatible with the very purpose of public education. *Cf. W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("That [boards of education] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source. . . ."); *Tinker*, 393 U.S. at 512 (noting that "personal intercommunication among the students" is "an important part of the educational process").

The School Board relies on cases in which courts have "agreed that language reasonably perceived as threatening school violence is not constitutionally protected." Br.

11

of Appellee at 22. We do not disagree. But Starbuck's remarks, as described in his complaint (which we must view in the light most favorable to him), were non-threatening statements about the tragedy that any student could have uttered in response to the news. For "school officials to justify prohibition of a particular expression of opinion, [they] must be able to show that [their] action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Mahanoy*, 141 S. Ct. at 2048 (quoting *Tinker*, 393 U.S. at 509).

The First Amendment does not permit schools to prohibit students from engaging in the factual, nonthreatening speech alleged here. Starbuck's amended complaint states a First Amendment claim against the School Board.

### B.

While Starbuck's First Amendment claim survives the School Board's motion to dismiss, his Fifth and Fourteenth Amendment claims do not, as the district court correctly held.

### i.

The Fifth Amendment's Due Process Clause does not apply to municipalities, but only to federal actors. Moreover, to the extent that Starbuck seeks to invoke the protections of the Fifth Amendment's Self-Incrimination Clause, he has not alleged that school officials "compelled [him] in those proceedings to furnish testimonial evidence that might incriminate [him] in later criminal proceedings." *Baxter v. Palmigiano*, 425 U.S. 308, 316 (1976). And to the extent Starbuck invokes the Fifth Amendment's Double Jeopardy Clause, that clause applies to criminal cases, not school discipline proceedings. *See*

12

*Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, No. 18 Civ. 63, 2020 WL 7330182, at \*8–9 (E.D. Va. Nov. 20, 2020).

ii.

Although Starbuck alleged several Fourteenth Amendment due process violations in the district court, he pursues only one on appeal. He argues that the School Board's shift in its description of the reason for his suspension (from self-protection and threats to the prevention of classroom disturbance) violated his Fourteenth Amendment right to due process. Br. of Appellant at 31–34.

We disagree. To be sure, accusing a student of one act and then suspending him because he committed another could well violate the Due Process Clause if the student never had any opportunity to respond to the ultimate reason for the suspension. *Cf. Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 26–28 (1st Cir. 2020) (holding that school officials cannot rely on post-hoc rationalizations asserted only after the start of litigation to defeat a student's First Amendment claim). But that is not what happened here. The School Board did not even attempt to change the factual basis for the suspension — it just used slightly different words to describe that basis. There is no unconstitutional bait-and-switch here because both parties always understood what particular speech constituted the basis for Starbuck's short-term suspension. Starbuck presents no case holding that in these circumstances merely changing the *description* of the reason for suspension constitutes a due process violation, and we have found none.

The School Board never mischaracterized the "basis of the accusation," *Goss*, 419 U.S. at 582, *i.e.*, the facts underlying the suspension. Moreover, just as *Goss* requires, the

13

Board gave Starbuck "an opportunity to explain his version of the facts" and "to characterize his conduct and put it in what he deem[ed] the proper context." *Id*. at 582, 584. Starbuck's arguments to the contrary incorrectly blur the line between labels and substance. Here, the record makes clear that Starbuck had multiple opportunities "to characterize his conduct" throughout the process of disputing his suspension and appealing it to the School Board. *Id*.; *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 85–86 (1978) (quoting *Goss*, 419 U.S. at 584). From the beginning, Starbuck had notice of the facts giving rise to his discipline and an opportunity to respond — exactly what due process requires.

Courts, for good reason, impose minimal due process requirements on the kinds of routine school discipline matters that school administrators confront every day. *See, e.g.*, *Wofford v. Evans*, 390 F.3d 318, 321, 323–24 (4th Cir. 2004). The only constitutional infirmity alleged in Starbuck's complaint is the punishment of protected speech itself.

IV.

For the foregoing reasons, we reverse the district court's dismissal of Starbuck's First Amendment claim and affirm its dismissal of his Fifth and Fourteenth Amendment claims. The judgment of the district court is

*AFFIRMED IN PART AND REVERSED IN PART.*

14