**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 23-1581**

_____

WARREN BALOGH,

Plaintiff − Appellant,

and

GREGORY CONTE,

Plaintiff,

v.

COMMONWEALTH OF VIRGINIA; TERENCE R. MCAULIFFE; VIRGINIA STATE POLICE; STEVEN FLAHERTY; BECKY CRANNIS-CURL; BRIAN JOSEPH MORAN; CITY OF CHARLOTTESVILLE; MICHAEL SIGNER; WES BELLAMY; CHARLOTTESVILLE POLICE DEPARTMENT; AL THOMAS, JR.; EDWARD GORCENSKI; SETH WISPELWEY; DWAYNE DIXON; DARYL LAMONT JENKINS; LACEY MACAULEY,

Defendants – Appellees.

_____

Appeal from the United States District Court for the Western District of Virginia, at Charlottesville. Norman K. Moon, Senior District Judge. (3:20−cv−00038−NKM)

_____

Argued: May 9, 2024                                    Decided: October 23, 2024

_____

Before DIAZ, Chief Judge, and NIEMEYER and RICHARDSON, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Diaz wrote the opinion, in which Judge Niemeyer and Judge Richardson joined.

**ARGUED:** Frederick Charles Kelly, III, LAW OFFICE OF FREDERICK C. KELLY, Monroe, New York, for Appellant. Erin Rose McNeill, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia; Melissa Yvonne York, HARMAN CLAYTOR CORRIGAN WELLMAN, Glen Allen, Virginia, for Appellees. **ON BRIEF:** Glen K. Allen, GLEN K. ALLEN LAW, Baltimore, Maryland, for Appellant. Richard H. Milnor, ZUNKA, MILNOR & CARTER LTD, Charlottesville, Virginia, for Appellees City of Charlottesville and Charlottesville Police Department. Rosalie P. Fessier, Brittany E. Shipley, TIMBERLAKE SMITH, Staunton, Virginia, for Appellee Wes Bellamy. David P. Corrigan, HARMAN CLAYTON CORRIGAN & WELLMAN, Richmond, Virginia, for Appellee Al Thomas, Jr.

DIAZ, Chief Judge:

This appeal asks a straightforward legal question: does the First Amendment protect speech amid violence? More specifically, does the First Amendment obligate police officers to protect the constitutional rights of protesters amid violence? We've already suggested that the answer is no. *Kessler v. City of Charlottesville*, No. 20-1704, 2022 WL 17985704, at *1 (4th Cir. Dec. 29, 2022) (per curiam). We say so explicitly today.

Warren Balogh asks that we hold otherwise to revive his complaint following the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). *Conte v. Virginia*, No. 3:20-cv-00038, 2023 WL 3121220, at *1 (W.D. Va. Apr. 27, 2023).[1] Balogh sued under 42 U.S.C. § 1983, broadly alleging that Al Thomas, Jr., Charlottesville's Chief of Police; Becky Crannis-Curl, a Virginia State Police Lieutenant; and the City of Charlottesville, violated Balogh's First and Fourteenth Amendment rights during his participation in the so-called "Unite the Right" rally.[2]

The rally erupted into violence between protesters (including Balogh) and counterprotesters, effectively cutting off everyone's speech and ultimately leading to multiple injuries, widespread property damage, and one death.[3] Despite the mayhem, law

---

[1] Gregory Conte, another named plaintiff, isn't a party to this appeal.

[2] Balogh also sued the Commonwealth of Virginia, the Virginia State Police, the Charlottesville Police Department, and ten other individual defendants. The district court dismissed the claims against these defendants, and Balogh doesn't challenge that decision.

[3] James Alex Fields, Jr. killed Heather Heyer after he deliberately drove his car into her and a group of other counterprotesters. J.A. 113.

enforcement followed Chief Thomas's directive not to intervene and did little to interrupt the participants' "mutual combat." *Conte*, 2023 WL 3121220, at *5.

Balogh would have us seize on these facts to transform the First Amendment from a shield to guard against invasive speech regulations into a sword to wield against violent speech disruptions. We decline to forge such a weapon, and instead affirm the district court's judgment dismissing the complaint.

I.

A.

Because the district court dismissed Balogh's complaint at the Rule 12(b)(6) stage, "we take as true all well-pleaded allegations in the complaint." *Turner v. Thomas*, 930 F.3d 640, 643 (4th Cir. 2019). We generally restrict our review to the complaint, but here, the district court granted the parties' request to incorporate by reference into the complaint an independent report prepared in the Unite the Right rally's aftermath ("Heaphy Report").[4] Thus, we consider that report in our review.

At the Rule 12(b)(6) stage, the "[f]actual allegations [in a complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Our review "does not . . . resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *See King v. Rubenstein*, 825 F.3d

---

[4] The law firm of Hunton & Williams (now Hunton Andrews Kurth), led by partner Timothy Heaphy, prepared the report, entitled "Independent Review of the 2017 Protest Events in Charlottesville, Virginia."

4

206, 212 (4th Cir. 2016) (cleaned up). Rather, to reverse the order of dismissal, we must find that the factual allegations "cross 'the line between possibility and plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557).

B.

In June 2017, the City of Charlottesville granted Jason Kessler a permit to hold the Unite the Right rally in Emancipation Park (formerly Lee Park) on August 12 of that year. Kessler and his compatriots organized the rally to protest the City Council's proposal to remove a statue of Robert E. Lee from the park.

The rally—even in its planning stages—attracted counterprotesters, many of whom were affiliated with Antifa.[5] These groups had "violently clashed" at earlier protests, "including [at] rallies in Portland, Berkeley, Sacramento, and Anaheim." J.A. 177. Indeed, local law enforcement received reports that the "Unite [t]he Right supporters would bring bats, batons, flag sticks, knives, and firearms to confront their political opponents," while counterprotesters "would attempt to disrupt the event using soda cans filled with cement and balloons or water bottles filled with paint, urine, or fuel." J.A. 177.

Because of these (then-)generalized threats of violence, the City of Charlottesville revoked Kessler's permit days before the scheduled rally, requiring him to move the demonstration to a different location. *See* J.A. 18 ¶ 29. But Kessler sued the city, seeking

---

[5] Antifa is "a portmanteau of the words, 'anti' and 'fascists.'" *Sines v. Hill*, 106 F.4th 341, 345 n.2 (4th Cir. 2024).

5

to enjoin its cancellation of his permit.  The district court granted an injunction, allowing the planned rally at Emancipation Park to proceed.  *Kessler v. City of Charlottesville*, No. 3:17-cv-00056, 2017 WL 3474071, at *1 (W.D. Va. Aug. 11, 2017).

"Rather than engage the crowd and prevent fights, the [law enforcement] plan [as conceived by Chief Thomas] was to declare the event unlawful [if violence ensued] and disperse the crowd."  J.A. 205; *see also* J.A. 207–08.  But the plan "was erratic and produced inconsistent approaches to the event."  J.A. 145.  Some officers understood their orders to require them to "make arrests and actively engage if necessary," J.A. 204, but others said they were instructed against "engaging attendees over 'every little thing,'" or "going . . . in and break[ing] up fights . . . unless it was something so serious that someone [would] get killed," J.A. 205.

As expected, the gathering sparked violence almost immediately.  Groups of counterprotesters, for example, sought to block the protesters from entering Emancipation Park, which prompted the protesters to push back with shields.  Brawls broke out with "video footage show[ing] demonstrators violently jabbing [flagpoles] at counter[]protesters' faces."  J.A. 237.  The counterprotesters then "fought back and tried to grab the flagpoles away."  J.A. 237.  "Eventually, the demonstrators pushed the counter[]protesters away with brute force and a cloud of pepper spray."  J.A. 237.

As the violence worsened, both protesters and counterprotesters pleaded with law enforcement to protect them.  But consistent with the operational plan, "[t]he officers

6

continued to stand in silence." J.A. 238. That is, until Chief Thomas declared an unlawful assembly, ordering everyone to disperse.[6]

The execution of that order, however, was haphazard, and did not "ensure separation between [the] conflicting groups." J.A. 242. As a result, the violence continued, leading to Balogh's alleged assault by counterprotesters and law enforcement.

C.

1.

Balogh filed a pro se complaint against numerous defendants, alleging four claims under 42 U.S.C. § 1983 and two under 18 U.S.C. § 1962. As relevant here, Balogh alleges under § 1983 that Chief Thomas and Lieutenant Crannis-Curl, and through them, the City of Charlottesville, violated his First and Fourteenth Amendment rights.

As to his First Amendment claims, Balogh argues that Chief Thomas and Lieutenant Crannis-Curl's refusal to intervene and Thomas's unlawful assembly declaration "restrict[ed] [Unite the Right] demonstrators from expressing specific viewpoints while at the same time permitting counter[]protesters to engage in violent and lawless behavior." J.A. 19 ¶ 32. In doing so, says Balogh, the defendants "engineered, ratified[,] and

---

[6] Balogh's complaint asserts that law enforcement didn't order that the counterprotesters disperse. J.A. 23 ¶ 48. But the Heaphy Report belies this claim. *See, e.g.*, J.A. 240 ("Zone commanders were instructed to announce the unlawful assembly and that *all present must disperse* or else be arrested." (emphasis added)). Here, where there's a "conflict between the bare allegations of the complaint and any exhibit attached, the exhibit prevails." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (cleaned up).

7

effectuated a heckler's veto, joining and facilitating a mob of counter[]protesters intent on suppressing speech." J.A. 26 ¶ 65.

As to his Fourteenth Amendment claims, Balogh asserts that "[b]y granting use of a public forum to people whose political views Defendants find acceptable, but denying use to those expressing less favored or more controversial views, . . . Defendants have violated the Equal Protection Clause." J.A. 27 ¶ 71.

Balogh also alleges a municipal liability claim against the City of Charlottesville. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Relying on a *respondeat superior* theory, Balogh argues that the City is liable for Chief Thomas's refusal to intervene and the injuries that followed.

2.

The district court dismissed Balogh's complaint, relying primarily on two of our earlier decisions. In the first, *Turner v. Thomas*, 930 F.3d 640 (4th Cir. 2019), we affirmed the district court's dismissal of similar § 1983 claims brought by a counterprotester who attended the Unite the Right rally. *Id.* at 643. The counterprotester alleged that Chief Thomas and the City of Charlottesville violated his Fourteenth Amendment rights by refusing to intervene. *Id.* Then, in *Kessler v. City of Charlottesville*, No. 20-1704, 2022 WL 17985704 (4th Cir. Dec. 29, 2022) (per curiam), we affirmed the district court's dismissal of First and Fourteenth Amendment claims brought by the Unite the Right rally's organizer, Jason Kessler, which were nearly identical to the claims that Balogh asserts here. *Id.* at *1.

8

Taking those decisions together, the district court held that Thomas and Crannis-Curl were entitled to qualified immunity because "there was no clearly established right to police intervention at the time of the [Unite the Right] rally," nor was there a "clearly established right to state protection of one's First Amendment rights from third parties." *Conte*, 2023 WL 3121220, at *5 (cleaned up).

Although the district court could have stopped there, it went further by addressing—and rejecting—Balogh's substantive First and Fourteenth Amendment claims. As to the former, the district court was unpersuaded by Balogh's arguments that the defendants had a duty to protect him from a hostile audience and that they imposed a heckler's veto by refusing to intervene and then later declaring an unlawful assembly. The court again relied on our decision in *Kessler*, explaining that Balogh's complaint "lack[ed] any plausible allegation that the unlawful assembly declaration and dispersal order discriminated based on content or viewpoint." *Id.* at *6.

The district court was even less impressed by Balogh's Fourteenth Amendment claim, noting that Balogh "devote[d] [only] four short allegations" to it. *Id.* at *7. Looking to *Kessler*, the district court found once more that Balogh failed to allege that the defendants "discriminated based on content or viewpoint." *Id.* (cleaned up). The district court noted that Balogh's allegations were either conclusory or failed to "permit[] a reasonable inference of disparate application or intentional discrimination" and that Balogh had conceded in the complaint that Thomas enforced his unlawful assembly order against "the people gathered in and around [Emancipation] Park—thus encompassing both Plaintiffs and the allegedly violent counter[]protesters." *Id.* (cleaned up).

9

Separately, the district court also rejected Balogh's *Monell* claim because he "alleged no facts indicating the City acted through an express policy, through decisions of persons with final policymaking authority, . . . or through a practice so persistent and widespread as to constitute custom or usage with the force of law." *Id.* at *6. The Charlottesville City Code provided that the City Manager "was the chief executive and administrative officer of the city government," as well as "the director of public safety, with general supervision over the police department of the city." *Id.* (cleaned up). Thus, the City Manager, rather than Chief Thomas, was the "final policymaker" for *Monell* purposes. *Id.*

From the district court's dismissal of the complaint, this appeal followed.

## II.

We review the district court's dismissal of Balogh's complaint de novo, "accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiff." *Turner*, 930 F.3d at 644. But "we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Id.* (cleaned up).

### A.

As did the district court, we begin our review of Balogh's claims against Chief Thomas and Lieutenant Crannis-Curl through the lens of qualified immunity. And, as did the district court, we find that both defendants are immune.

10

"Qualified immunity shields state actors from liability under § 1983 . . . when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Turner*, 930 F.3d at 644 (cleaned up). So, to defeat qualified immunity, Balogh must do two things: (1) allege "a violation of a federal right," and (2) show that "the right at issue [was] clearly established at the time of the alleged violation." *Id.* If Balogh fails to meet his burden at either step, then the defendants are entitled to qualified immunity.

Because Balogh's burden is two-fold, we can begin with either step, and needn't reach the second step if the first proves dispositive. That's what we did in *Turner*, beginning—and ending—with the clearly established prong. *Id.* We could do the same here, but instead will explain why Balogh fails at both steps.

B.

Start with Balogh's alleged constitutional violations, which he argues fall under the First and Fourteenth Amendments. Balogh's clear focus, however, is on his First Amendment claim, which takes up nearly all his briefing. First, he initially posits that we should import into the First Amendment context a Fourteenth Amendment doctrine that obligates a state to act. From there, he argues that Chief Thomas's and Lieutenant Crannis-Curl's actions (or inactions) during the rally amounted to a heckler's veto, which unlawfully suppressed his speech.

Turning to Balogh's first contention, "as a general matter, a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Turner*, 930 F.3d at 645 (cleaned up). That said, in *DeShaney v.*

11

*Winnebago County Department of Social Services*, 489 U.S. 189, 199–201 (1989), the Supreme Court established two exceptions to this rule that we later applied in *Pinder v. Johnson*, 54 F.3d 1169, 1174–77 (4th Cir. 1995) (en banc).  One exception is the state-created danger doctrine, "under which state actors may be liable for failing to protect injured parties from dangers which the state actors either created or enhanced." *Turner*, 930 F.3d at 644.

The problem for Balogh is that by the close of briefing, he all but abandons this Fourteenth-turned-First-Amendment theory of liability.  He insists, for instance, that "*DeShaney* and *Pinder* should not govern this First Amendment case," because allowing them to would be "akin to hammering a square peg into a round hole."  Reply Br. at 12. Putting a finer point on it, Balogh explains that these cases "were fashioned to address Due Process, not First Amendment claims."[7] *Id.*  On this narrow issue, we agree with Balogh.

Neither we nor, seemingly, any other court has ever applied this Fourteenth Amendment exception to a First Amendment claim.  Moreover, and as the district court explained in *Kessler*, "the First Amendment merely guarantees that the state will not suppress one's speech . . . [,] [i]t does not guarantee that the state will protect individuals when private parties seek to suppress it." *Kessler v. City of Charlottesville*, 441 F. Supp.

---

[7] Balogh doesn't try to make this argument for his actual Fourteenth Amendment claim.  He cites *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133–35 (9th Cir. 2018), a due process analog under reasonably similar facts, but only for his First Amendment claim. Because Balogh barely nods at a due process argument, we decline to "research and construct" one for him.  *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 727 (4th Cir. 2021) (cleaned up).

12

3d 277, 286–87 (W.D. Va. 2020). Following Balogh's lead, we won't expand the First Amendment beyond where it belongs.

C.

Balogh's second argument invoking the heckler's veto has more legs, but ultimately, none to stand on.

The heckler's veto doctrine, which, at bottom, prohibits a state from suppressing the speech of a peaceful speaker because of a hostile audience, was born out of several First Amendment concerns.

To begin, the First Amendment has long protected unpopular and even offensive speech. *See Nat'l Socialist White People's Party v. Ringers*, 473 F.2d 1010, 1016 (4th Cir. 1973) (en banc). Indeed, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (cleaned up).

Thus, "if speech provokes wrongful acts on the part of hecklers, the government must deal with those wrongful acts directly; it may not avoid doing so by suppressing the speech." *Meinecke v. City of Seattle*, 99 F.4th 514, 518 (9th Cir. 2024) (cleaned up). Put another way, a state can't "silence[] *particular* speech or a *particular* speaker due to an anticipated disorderly or violent reaction of the audience." *Id.* at 522 (cleaned up).

We've recognized the heckler's veto as "one of the most persistent and insidious threats to [F]irst [A]mendment rights," "imposed by the successful importuning of government to curtail 'offensive' speech at peril of suffering disruptions of public order."

13

*Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985). Though the heckler's veto may involve an "understandable impulse to buy. . . peace," a state offends the Constitution when its restrictions "chill speech." *Id.* Curbing speech under those circumstances is an "impermissible form of content-based speech regulation." *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 554 (4th Cir. 2010).

Balogh alleges that the defendants imposed a heckler's veto by refusing to intervene and issuing an unlawful assembly order. He relies on *Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015) (en banc), for the proposition that "police officers cannot 'sit idly on the sidelines—watching as the crowd imposes, through violence, a tyrannical majoritarian rule.'" Appellant's Br. at 45 (quoting *Bible Believers*, 805 F.3d at 253). Rather, argues Balogh, "the police must first make bona fide efforts to protect the speaker from the crowd's hostility." *Id.* (quoting *Bible Believers*, 805 F.3d at 255).

*Bible Believers* warrants a closer look. There, the plaintiffs, an evangelical Christian group and its members, attended an Arab International Festival and preached offensive messages to the mostly Muslim crowd, with signs reinforcing these messages. *Bible Believers*, 805 F.3d at 238. The group carried a severed pig's head on a spike. *Id.*

The crowd's response to the plaintiffs' message was hostile—jeering, throwing bottles and other debris, and shouting profanities. *Id.* at 239. The Bible Believers' conduct in response "was at all times peaceful while they passionately advocated for their cause." *Id.* at 257.

Law enforcement did not intervene to stop the crowd's "belligerence and . . . assaultive behavior." *Id.* at 239. To the contrary, an officer told the group that they were

14

"a danger to public safety right now," *id.*, explaining that "what you are saying to them and what they are saying back to you is creating danger," *id.* at 240. The officer then left. *Id.* When the crowd resumed throwing bottles at the group, officers returned and escorted the group from the festival, effectively "cutting off [their] speech." *Id.* at 243.

An en banc Sixth Circuit held that the officers "effectuated a heckler's veto," violating the First Amendment. *Id.* The court explained that "[w]hen *a peaceful speaker*, whose message is constitutionally protected, is confronted by a hostile crowd, the state may not silence the speaker as an expedient alternative to containing or snuffing out the lawless behavior *of the rioting individuals*." *Id.* at 252 (emphases added). But the court also recognized an officer-safety backstop to the heckler's veto: "[T]he Constitution does not require that the officer 'go down with the speaker.'" *Id.* at 253. "If, in protecting the speaker or attempting to quash the lawless behavior, the officer must retreat due to risk of injury, then retreat would be warranted." *Id.* (cleaned up).

The Ninth Circuit faced a similar scenario this year in *Meinecke v. City of Seattle*, 99 F.4th 514 (9th Cir. 2024). There, plaintiff Matthew Meinecke peacefully read Bible passages at a pair of events—an abortion rally and an LGBTQ pride festival—and attendees at both events "began to abuse and physically assault [him]." *Id.* at 517. Police, "rather than deal[ing] with the wrongdoers directly," "asked Meinecke to move and ultimately arrested him when he refused." *Id.*

Meinecke never responded violently to the attendees, nor did he threaten them, even when they "seized and ripped his Bible, poured water on him, took his shoes, and physically carried him across the street." *Id.* at 523. The Ninth Circuit thus found it "indisputable

15

that the officers curbed Meinecke's speech because of the potential reaction of the listeners," *id.*, "target[ing] [his] speech only once the audience's hostile reaction manifested," *id.* at 523–24.

*Bible Believers and Meinecke* illustrate several hallmarks of a heckler's veto: (1) a peaceful speaker; (2) a hostile crowd; and (3) a state actor that "cuts off" only the peaceful speaker because of the crowd's reaction to their speech. But even the most deferential reading of Balogh's complaint would show a mismatch between these hallmarks and his alleged facts. To borrow Balogh's earlier phrase, comparing those cases to his is "akin to hammering a square peg into a round hole."

However peaceful the Unite the Right protesters may have been at the rally's inception, they did not remain so. Balogh casts the protesters as merely fighting back to avoid "martyrdom" at the hands of Antifa, Appellant's Br. at 40, and that the protesters "were not *primarily* looking to fight,"[8] Reply Br. at 5 (emphasis added). But he doesn't dispute that the protesters were "prepared for combat" and engaged in it. *Id.* at 5–6.

---

[8] Although we take as true all well-pleaded facts in Balogh's complaint and those facts in the Heaphy Report, there's good reason to be skeptical of Balogh's account. We recently reinstated in part a multi-million-dollar damages verdict awarded to a group of counterprotesters who had been injured by protesters during the Unite the Right rally. *See Sines*, 106 F.4th at 344. The evidence in that case showed that "[Kessler] and his codefendants planned for months to provoke Antifa and its followers into a violent battle at Unite the Right," so that "any punch thrown by an Antifa supporter would give them a chance to respond with brutal and overwhelming violence." *Id.* at 345 (cleaned up); *see also id.* (noting Kessler asked his followers to "taunt Antifa a little on social media" and to "tip off Antifa" about the rally location to ensure confrontations (cleaned up)). The *Sines* jury also heard that the protesters shared online messages before the rally "demonstrating that they shared expectations of, hoped for, planned for, and purposefully sought to

More strikingly, law enforcement didn't decline to intervene on behalf of only one group. And when Chief Thomas declared an unlawful assembly, he didn't enforce that directive selectively. If we accept Balogh's proposition that law enforcement failed to keep the peace or to protect First Amendment rights, that failure was total, at least until everyone was ordered to disperse.

In fact, even if Balogh had not engaged in mutual combat, a heckler's veto claim would fail all the same because law enforcement silenced the so-called hecklers too. Moreover, the police here are entitled to the benefit of *Bible Believers*' officer-safety backstop. They did not have to "go down with the speaker" during the escalating violence between the protesters and counterprotesters. 805 F.3d at 253.

We affirm the district court's ruling rejecting Balogh's First Amendment claim.

### D.

Balogh alleges next that the district court erred in dismissing his Fourteenth Amendment equal protection claim because the court's "assertion that [his] allegations were merely conclusory fails to take into account the relevant detail the Heaphy Report provides," and because the district court's opinion "profoundly skews basic First Amendment jurisprudence" by concluding that the "pro-monument dissident right protesters and the Antifa/counter[]protesters were . . . on equal footing." Appellant's Br. at 48.

---

instigate violence at Unite the Right—including discussing whether someone could drive a car through a crowd of demonstrators that might be blocking the street." *Id.* (cleaned up).

17

But aside from directing us to First Amendment cases that he claims supports his Fourteenth Amendment claim, Balogh devotes a scant three pages of his briefing to the claim and fails to provide a single legal or record citation supporting it in his opening brief. We have dismissed claims on this ground alone, and could do so here. *Edwards v. City of Greensboro*, 178 F.3d 231, 248 n.6 (4th Cir. 1999) (citing Fed. R. App. P. 28(a)(9)(A) (1998), which now appears at Fed. R. App. P. 28(a)(8)(A)).

In any event, the claim fails on the merits. To state a Fourteenth Amendment equal protection claim, "a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Sandlands C & D LLC v. County of Horry*, 737 F.3d 45, 55 (4th Cir. 2013). Should a plaintiff make that showing, we then "analyze[] the disparity under an appropriate level of scrutiny." *Id.*

Although Balogh argues that "it is manifest . . . that [he] and the other pro-monument protesters were intentionally and harmfully discriminated against based on their viewpoint," Reply Br. at 19, he doesn't direct us to any supporting facts in the Heaphy Report or his complaint. And the conclusory allegations Balogh makes about some concerted animus toward his views aren't sufficient to ascribe that animus to Chief Thomas or Lieutenant Crannis-Curl (or, by extension, the City of Charlottesville).

The Rule 12(b)(6) standard is deferential to plaintiffs, but it still requires facts from which we can plausibly infer a constitutional violation. *See Francis*, 588 F.3d at 193 ("[N]aked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief."

(cleaned up)). Because Balogh's complaint gives us none, the district court was right to reject the Fourteenth Amendment claim.

## E.

As explained above, the defendants did not violate Balogh's constitutional rights. But the constitutional claims also fail because the alleged rights were not clearly established.

Balogh cites general First Amendment principles to contend that Chief Thomas and Lieutenant Crannis-Curl were on notice that he had "the right to some level of police protection." Appellant's Br. at 44. But the cases he relies on didn't grapple with the circumstances here—a violent confrontation between protesters and counterprotesters. And our precedent requires that we "not define clearly established law at a high level of generality." *Atkinson v. Godfrey*, 100 F.4th 498, 505 (4th Cir. 2024) (cleaned up).

"Defining the right at a high level of generality avoids the crucial question whether the officer acted reasonably in the particular circumstances that he or she faced." *Id.* (cleaned up). Balogh never reaches beyond this high level of generality to explain why Chief Thomas or Lieutenant Crannis-Curl would know that they had to intervene on his behalf during an increasingly violent protest. So for this separate reason, the district court correctly dismissed Balogh's constitutional claims.

## F.

Balogh's *Monell* claim fares no better. Like qualified immunity, it too requires an underlying constitutional violation. *See Washington v. Hous. Auth. of Columbia*, 58 F.4th 170, 182 (4th Cir. 2023). As we've already found, Balogh hasn't articulated one.

But Balogh's *Monell* claim would fail even if he had.  As the district court found, the City Manager, rather than the Chief of Police, is the final policymaker for the City of Charlottesville.  Balogh argues in passing that the City Manager ratified Chief Thomas's nonintervention order or delegated his authority to Thomas.  But the only fact Balogh identifies for this proposition is the Heaphy Report's single mention that the City Manager may have been present in law enforcement's "Command Center" with Chief Thomas during the rally.  *See* Appellant's Br. at 47; *see also* J.A. 217.  Such a bare assertion doesn't constitute either delegation or ratification.  *See Hunter v. Town of Mocksville*, 897 F.3d 538, 555–58 (4th Cir. 2018); *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 534–36 (4th Cir. 2022).

The district court properly dismissed this claim too.

## III.

The right to protest is a core First Amendment guarantee.  Nothing about our decision today changes that.  Rather, we reiterate that the First Amendment protects peaceful protesters from a state seeking to suppress their speech.

But this isn't a case where state actors silenced Balogh's voice while permitting lawlessness from a hostile public.  Nor is it a case where that hostile public received preferential treatment from the state.  Instead, the state treated all speakers equally in disbanding a violent protest.

For these reasons, the district court's judgment dismissing the complaint is

*AFFIRMED.*

20