**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-1682**

───────────

SAGE LILY BLAIR; MICHELE BLAIR,

> Plaintiff - Appellants,

> v.

APPOMATTOX COUNTY SCHOOL BOARD; DR. ANNETTE A. BENNETT, Individually and in her official capacity as Superintendent of Appomattox County Public Schools; DENA OLSEN, individually and in her official capacity as school counselor at Appomattox County High School; AVERY VIA, individually and in his official capacity as school counselor at Appomattox County High School,

> Defendants - Appellees,

> and

ANEESA KHAN, individually,

> Defendant.

───────────

Appeal from the United States District Court for the Western District of Virginia, at Lynchburg. Norman K. Moon, Senior District Judge. (6:23-cv-00047-NKM-CKM)

───────────

Argued: May 6, 2025                               Decided: August 7, 2025

───────────

Before WILKINSON, GREGORY, and BENJAMIN, Circuit Judges.

───────────

Affirmed in part, reversed in part, and remanded by published opinion. Judge Gregory wrote the opinion, in which Judge Benjamin joined. Judge Wilkinson wrote a separate opinion concurring in part and dissenting in part.

---

**ARGUED:** Mary Elizabeth McAlister, CHILD & PARENTAL RIGHTS CAMPAIGN, Norcross, Georgia, for Appellants. Melissa Yvonne York, HARMAN, CLAYTOR, CORRIGAN & WELLMAN, Glen Allen, Virginia; Andrew Butz, KIERNAN TREBACH, LLP, Washington, D.C., for Appellees. **ON BRIEF:** Jeremy D. Capps, Brian P. Ettari, HARMAN, CLAYTOR, CORRIGAN & WELLMAN, Glen Allen, Virginia, for Appellees Appomattox County School Board, Annette A. Bennett, and Dena Olsen. Heather S. Deane, Patrick J. Crowley, Brandi R. Howell, Charles Sipe, KIERNAN TREBACH LLP, Washington, D.C., for Appellee Avery Via.

---

GREGORY, Circuit Judge:

During a two-week period in August 2021, S.B.—a 14-year-old girl[*] who suffered from gender dysphoria—was harassed, sexually assaulted, and threatened at school upon being advised by a school counselor that she could use the boys' restroom. Blair, S.B.'s paternal grandmother and adoptive mother, sued the high school staff and school board as a result, alleging various constitutional violations. Blair's appeal focuses on the district court's dismissal of her claims. Finding only the deliberate indifference claim was improperly dismissed, we affirm in part, reverse in part, and remand for further proceedings.

I.

S.B. was placed in foster care as an infant after her father died and her mother was unable to care for her. J.A. 50. Blair, S.B.'s paternal grandmother, and her husband adopted S.B. at age two. J.A. 48, 50. S.B. "had spent many months in the foster care system and suffered trauma before being adopted by the Blairs." J.A. 50. Since being in the care of the Blairs, S.B. has not suffered trauma, abuse, or neglect. *See* J.A. 61.

With the "onset of puberty in 2019," S.B. began experiencing "distress" about her body. J.A. 50. She also experienced hallucinations, suffered from depression and eating disorders, and began engaging in self-harm. *Id*.

---

[*] The record is silent as to S.B.'s current gender identification. So, consistent with Blair's briefing in this case, this memo will refer to S.B. with female pronouns.

3

During the 2020-2021 school year, S.B. was enrolled in middle school in Appomattox County Public Schools. *Id*. The middle school staff "regularly interacted" with Blair "when they noticed S.B. was having difficulties, including noticing evidence of self-harm." *Id*. Blair was "able to act on that information and work with S.B.'s private counselors to therapeutically address the issues." *Id*. "Toward the end of the 2020-2021 school year," S.B.'s symptoms grew worse, and consequently, she was admitted for in-patient psychiatric care from June 1 through June 8, 2021. *Id*.

Soon after, "S.B. was enrolled for her freshman year" at Appomattox County High School ("ACHS"), and Blair "provided school staff with information from S.B.'s mental health records, including the diagnoses of 'major depressive disorder, recurrent episode' and 'intentional self-harm by sharp object' and her hospitalization for treatment of those diagnoses." *Id*. Therefore, "the school had knowledge of S.B.'s mental health diagnoses and her very recent history of self-harm and in-patient psychiatric hospitalization." J.A. 51.

On August 5, 2021, S.B. underwent a psychiatric evaluation. J.A. 50. On August 10, 2021, S.B. started her freshman year at ACHS. J.A. 51. S.B. was "gender non-conforming" in her "dress and interests" and liked "emo" style dress, such as "band shirts and jeans, and skateboarding." *Id*. Blair "supported the unconventional choices and helped S.B. buy 'emo' style clothes for school." *Id*.

On August 11, 2021, the results of S.B.'s psychiatric evaluation was prepared, and included a diagnosis of "severe gender dysphoria" and related symptoms. J.A. 51. Blair did not receive a copy of the report but was scheduled to meet with the treatment team on August 27, 2021. *Id*.

4

That same day, on August 11, Dena Olsen, a counselor at ACHS, heard from S.B.'s science teacher that "she overheard S.B. telling a friend that S.B. wanted to be referred to by a male name and pronouns." J.A. 51. That same day, Olsen "met S.B. in the hallway and asked S.B. if she identified as a boy or girl." *Id*. S.B. "indicated that she identified as a boy." *Id*. Olsen "did not explore S.B.'s assertion of a male identity." J.A. 52. Instead, Olsen told S.B. that "if she identified as a boy, she could use the male restroom at school." J.A. 51. Olsen "did not notify" Blair about S.B.'s statement that she identified as a boy, and did not notify Blair about her instructions to S.B. to use the male privacy facilities. J.A. 52. S.B.'s peers "were not so accepting of her choices[.]" J.A. 51. That same day, "a group of boys began harassing and threatening her on the school bus." *Id*.

On August 12, 2021, S.B. met with Olsen and another counselor, Avery Via, who was providing counseling services to ACHS students under a contract with the school district. J.A. 49, 52. At the meeting, S.B. discussed the "bullying and harassment" that occurred on the school bus the day prior. *Id*. Specifically, S.B. reported that "boys on the school bus directed profane epithets at her because she looked like a boy, threatened to sodomize her until she 'liked boys,' threatened to hold her out of the window of the bus by her hair until she apologized, and made other similar threats." *Id*. Other students "reportedly threatened to shoot her and told her they knew where she lived." *Id*. Olsen and the assistant principal of ACHS "reviewed recordings from the bus" from that day, but "allegedly did not view threatening behavior or hear the threats reported by S.B. on the video recording." J.A. 52–53. However, Olsen "interviewed other students who were on the bus who confirmed the events as relayed by S.B." J.A. 53. S.B. also discussed her

5

identity with Olsen and Via. J.A. 52. Specifically, S.B. told them that she identified as a boy and wanted to use a male name, "D," and he/him pronouns. J.A. 52. Olsen and Via "claimed that S.B. told them that her parents were not supportive of her gender identity." J.A. 52. Blair contends that she was not aware of S.B.'s asserted male identity and preferred name/pronouns, as S.B. had not yet told her or her husband, and no one from ACHS had informed them. J.A. 52.

That same day, after the meeting, Olsen called Blair to pick S.B. up from school. J.A. 53. During the discussion about the events that occurred on the bus, Olsen only informed Blair that there had been an "incident" on the bus, but did not provide any further details. *See* J.A. 53. Olsen did not inform Blair "that S.B. was identifying as a boy named 'D' at school, using male pronouns and using the male restroom, or that S.B. was being bullied and sexually harassed by male classmates." J.A. 53. In fact, although staff was "consistently" calling S.B. by the male name "D," S.B. asked Olsen not to use that name with Blair because "it might upset her." *Id.* Accordingly, Olsen referred to S.B. as "S" throughout her interaction with Blair. *See id.*

"A few days later," Olsen told S.B. that "her female classmates were uncomfortable with S.B. using the girls' bathroom so S.B. should only use the boys' bathroom." J.A. 51. But S.B. continued to be "subjected to harassments, threats, and assaults in the hallways and the male bathrooms[.]" J.A. 53. Specifically, "[b]oys were following behind her in a group, touching her, threatening her with knife violence and rape, and shoving her against the hallway wall." *Id.* Olsen was on notice "that S.B. was vulnerable to such threats" considering what occurred to S.B. on the bus a few days prior, but did not "check on S.B.'s

6

welfare." J.A. 53. Instead, Olsen called S.B. "into the counseling office to discuss gender identity eight times during the 12 days school had been in session." *Id*. In the sessions, Olsen encouraged S.B. to "embrace" her male identity, and Via "directed S.B. to internet sites, apps, and social media networks that promoted transgender ideas, indicating she could find friends there." J.A. 54. Olsen nor Via notified Blair of these sessions or told Blair that they were "affirming [S.B.] as a male[.]" J.A. 54.

On August 23, 2021, Olsen was "informed that school and District administrators had received reports from parents about incidents in the boys' restrooms during the times S.B. was using them as directed by [] Olsen." J.A. 53–54.

On August 24, 2021, Olsen and school counselor Amy Moore met with S.B. to "discuss[] her use of the boys' bathroom." J.A. 55. Olsen and Moore mentioned "concerns" raised about S.B. using the boys' bathroom. *Id*. S.B. reported that she was "threatened, harassed, and sexually assaulted when she was using the restroom." *Id*. S.B. further stated that "all the boys are rapists," and explained that she defined "rape" as "inappropriate touching." *Id*. Olsen and Moore agreed that S.B. would begin using the nurse's restroom. J.A. 55. At this point, Olsen still did not notify Blair "about S.B.'s assertion of a male identity, use of male names, pronouns, and restrooms at school, the counselors' affirmation of that identity, and the harassment, threats and assaults related to S.B's assertion of a male identity." *Id*.

On August 25, 2021, Olsen and Daniel Gunter, a deputy sheriff and school resource officer, met with S.B. J.A. 56. Olsen and Officer Gunter "implied that S.B. had fabricated

7

the reports of threats of rape from males and pressured her to recant her story." *Id*.

Specifically, Olsen told S.B:

> There was some information you shared from the bus incident that was
> untrue and there were some parts that were true. When you report
> information to us it is important to tell us the entire story. You never want
> to falsify a report. Or when you said yesterday that every boy in the school
> was a rapist. It is not fair to label every boy in the school a rapist. That is
> considered defamation of character. If you walked out of here and said every
> boy is a rapist and a boy called his dad who had the money, he could sue you
> for defamation of character when you have no basis to call every boy in the
> school a rapist. I'm not saying there is not an individual in this town that is
> not that. However, you cannot confidently say and I know and he knows that
> not every male in this school is a rapist. It is so important to know that you
> cannot say things because you are upset.

*Id*. Officer Gunter further advised S.B. that "she could face a civil lawsuit if she continued

to accuse innocent males of threatening her." *Id*. S.B. "defended her statements" and

explained:

> I didn't want to tell you anything about this. Any time you have called me
> in here for something, I didn't want to tell you about any of it. I think you
> are here to uphold the law because that's the way it is. You are supposed to
> keep your students safe. If you hear something about rape, you have to do
> something.

*Id*. Olsen and Officer Gunter never notified Blair or her husband about the interrogation.

*Id*. However, that same day following the interrogation, Olsen informed Blair that S.B.

had been using the boys' restrooms but said only that there were "safety concerns." J.A.

57. Olsen did not tell Blair that "S.B. said she identified as a boy and that in response to

that school staff had been using a male name and pronouns for S.B. as well as permitting

and encouraging her to use the male restroom, or that S.B. was the victim of harassment,

threats, and assaults." *Id*.

8

That same day, after returning home, Blair "found a hall pass with the name 'D' on it" and subsequently, S.B. told Blair that she was identifying as a boy at school. J.A. 58. "This was the first time that Blair learned that S.B. asserted a male identity at school." *Id.* S.B. then told Blair that a group of male students had "jacked" her up against the wall of the boys' bathroom "and threatened her with violence[,]" and S.B. was "terrified of what they would do." *Id.* S.B. also told Blair that "she would not have been using the boys' bathroom except for the fact that [] Olsen instructed her to do so." *Id.* Blair told S.B. that "she did not need to return to school" and that they would "figure it out in the morning." *Id.*

Later that night, S.B. was "still frightened and was afraid she and her family would be subjected to more threats or harm" and as a result, "suffered a psychotic breakdown and decided to run away." J.A. 58. Shortly after, S.B. was abducted by sex traffickers and ended up in the custody of the Maryland Department of Juvenile Services for at least two months. J.A. 58, 61, 63, 65. S.B. ultimately ran away again, once more falling victim to sex trafficking. J.A. 65.

Due to these events, Blair was unable to meet with the treatment team on August 27, 2021 to discuss S.B.'s psychiatric evaluation results prepared on August 11, 2021 that included a diagnosis of "severe gender dysphoria" and related symptoms. J.A. 51.

Blair alleged that the high school staff and the School Board are to blame for the harm inflicted upon S.B. and their family, for their failure to notify Blair that her child was identifying as a male at school, and enduring threats and sex-based harassment as a result. Blair alleged that the School District's policy provided, in relevant part, that reports of sexual harassment, which includes "unwelcome sexual physical contact, unwelcome

9

ongoing or repeated sexual flirtation or propositions, . . . threats, verbal abuse, . . . and graphic comments about an individual's body" must be reported to the District's Title IX compliance officer and be investigated. J.A. 56. Olsen, Via, and Officer Gunter failed to alert the Title IX compliance officer of S.B.'s complaints. J.A. 57.

Blair "was notified and had to consent to her daughter receiving a Tylenol at school, yet was never informed about something as consequential as being affirmed as a boy, using the boys' bathroom and being harassed and sexually assaulted at school." J.A. 55. Blair alleged that "Olsen and Via's concealment of information . . . was part of a District protocol or guideline that directed staff to not inform parents when their children expressed a discordant gender identity and asked to be treated as the opposite sex, using opposite sex names and pronouns and us[ing] opposite sex privacy facilities, unless the minor child agrees to disclosing the information." J.A. 57. Blair further alleged that Dr. Bennett "and members of the School Board were aware of the protocol or guideline, adhered to, and implemented it" and "fail[ed] to adequately direct, train, and/or supervise [the school district's] administration and staff[.]" J.A. 57, 68.

## II.

As a result of these events, and as relevant here, Blair filed suit against defendants Appomattox County School Board, Dr. Annette Bennett (individually and in her capacity as Superintendent of Appomattox County Public Schools), Dena Olsen (individually and in her capacity as school counselor), and Avery Via (individually and in his capacity as school counselor) alleging various constitutional violations. Specifically, Blair's operative

amended complaint brought a deliberate indifference to sexual harassment/hostile sex environment claim against Appomattox County School Board pursuant to Title IX, a *Monell* claim against Appomattox County School Board premised upon policy and failure to train theories, and three substantive due process claims against all defendants, pursuant to 42 U.S.C. § 1983. With respect to the substantive due process claims, Blair alleged that all defendants violated her fundamental right to direct upbringing of S.B. and her right to familial privacy. Blair brought an additional right to familial privacy claim on behalf of S.B. The defendants filed a motion to dismiss. The district court granted the motion to dismiss, finding Blair failed to allege deliberate indifference and *Monell* liability, and that Dr. Bennett, Olsen and Via were entitled to qualified immunity regarding the substantive due process claims. Blair timely appealed.

### III.

We review the grant of a motion to dismiss de novo. *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016). In so doing, we "accept[] all well-pleaded facts as true and draw[] all reasonable inferences in favor of the plaintiff." *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019). We "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments" as the complaint must provide "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*.

IV.

Before us on appeal is the district court's denial of Blair's five claims—namely, her deliberate indifference claim against Appomattox County School Board, her *Monell* claim against Appomattox County School Board, and her three substantive due process claims against all defendants. We address each claim in turn and find only Blair's deliberate indifference claim was improperly dismissed.

A.

We first start with Blair's deliberate indifference claim. To begin, in order to succeed on a Title IX claim premised on sexual harassment, a plaintiff must show that: (1) the educational institution receives federal funds; (2) the plaintiff "was subjected to harassment based on her sex"; (3) "the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity"; and (4) "there is a basis for imputing liability to the institution." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018). With respect to the fourth prong, liability of a school arises only in cases of deliberate indifference, or "where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 630 (1999). A school must engage in efforts that are "reasonably calculated" to end the harassment. *Ricketts v. Wake Cnty. Pub. Sch. Sys., WCPSS*, 125 F.4th 507, 523 (4th Cir. 2025).

As an initial matter, only the fourth prong, i.e., whether Appomattox County School Board was deliberately indifferent, is in dispute. At this stage, Blair has sufficiently alleged deliberate indifference. Specifically, Blair alleged that Olsen and Via received a report

12

from S.B. regarding bullying and sexual harassment on the bus, to which Olsen reviewed recordings and interviewed students who confirmed the events as relayed by S.B. J.A. 52–53. But nothing in the amended complaint suggests that Olsen, Via, or any school administrator interviewed the boys who were harassing S.B. on the bus or took any disciplinary action against them. What's more, Blair alleged that after the bus incident, S.B. continued to be "subjected to harassments, threats, and assaults in the hallways" to which "Olsen was on notice" but failed to "check on S.B.'s welfare." J.A. 53. Specifically, "[b]oys were following behind her in a group, touching her, threatening her with knife violence and rape, and shoving her against the hallway wall." J.A. 51. In fact, parents contacted school administrators and reported incidents occurring in the boys' restrooms during the times in which S.B. was using them as directed by Olsen, and it was only after receiving such reports that Olsen and Moore directed S.B. to use the nurse's restroom instead. J.A. 53–55.

While the Appomattox County School Board was not entirely unresponsive to S.B.'s claims of harassment and found an alternative restroom for S.B. to use, to conclude that directing S.B. to use the nurse's restroom is enough to constitute a "reasonably calculated" effort would do no more than take S.B.'s harassment in piecemeal. *See Laurent-Workman v. Wormuth*, 54 F.4th 201, 218 (4th Cir. 2022) (finding, in the context of a Title VII harassment claim, "a discrimination analysis must concentrate not on individual incidents, but on the overall scenario") (quoting *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015)); *see Ricketts*, 125 F.4th at 522 (finding the same in the context of a Title VI harassment claim). There is no indication that Appomattox County

13

School Board took any action against the boys on the bus who threatened her with sexual violence, or the students who "threatened to shoot [S.B.] and told her they knew where she lived." J.A. 52. There is further no indication that Appomattox County School Board took any action against the group of male students who "jacked" S.B. up against the wall and "threatened her with violence." J.A. 58. In fact, the direct opposite happened and action was taken against S.B., in the form of her being interrogated by Olsen and Officer Gunter "and pressured to recant" her reports of threats and rape. J.A. 56. And, even after S.B. was directed to use the nurse's restroom, S.B. continued to be so fearful for her and her family's life that she "suffered a psychotic breakdown" and opted to run away from home to save her family. J.A. 58. As such, the Appomattox County School Board did not take "reasonably calculated" efforts to end the harassment S.B. endured from her peers. *See Hurley*, 911 F.3d at 689 (finding "although [the university] was not entirely unresponsive to allegations of harassment—[the university] did not engage in efforts that were reasonably calculated to end the harassment" because the university "merely responded with two listening circles, a generic email, and by sending a campus police officer with a threatened student on one evening") (internal quotation marks and brackets omitted).

Collectively, and in summary, Blair's allegations are sufficient to state a Title IX claim for deliberate indifference at this stage against the Appomattox County School Board. Accordingly, the district court erred in dismissing her claim.

## B.

Next, we turn to Blair's *Monell* claim premised upon policy and failure to train theories. To start, a school board may be held liable under *Monell* "(1) through an express

14

policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifests deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022) (internal brackets omitted) (referencing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).

We find that Blair's *Monell* claim was properly dismissed. Here, Blair merely alleged that "Olsen and Via's concealment of information . . . was part of a District protocol or guideline that directed staff to not inform parents when their children expressed a discordant gender identity and asked to be treated as the opposite sex, using opposite sex names and pronouns and us[ing] opposite sex privacy facilities, unless the minor child agrees to disclosing the information" and Dr. Bennett, as well as "members of the School Board were aware of the protocol or guideline, adhered to, and implemented it" and "fail[ed] to adequately direct, train, and/or supervise [the school district's] administration and staff[.]" J.A. 57, 68. But such allegations are conclusory and fail to establish *Monell* liability even at this stage. In addition, to the extent Blair now attempts to allege a *Monell* claim premised upon another theory, such allegations are not in Blair's amended complaint, and this Court need not "accept on appeal theories that were not raised in the district court except under unusual circumstances that would result in a miscarriage of justice." *Agra, Gill & Duffus, Inc. v. Benson*, 920 F.2d 1173, 1176 (4th Cir. 1990). Accordingly, the district court properly dismissed her claim.

15

C.

Lastly, we turn to Blair's three substantive due process claims under 42 U.S.C. § 1983 in which Blair alleged that Dr. Bennett, Olsen and Via violated her fundamental right to direct upbringing of S.B., her right to familial privacy, and S.B.'s right to familial privacy. To determine whether a school officer is entitled to qualified immunity, a court must determine (1) whether a constitutional violation occurred, and (2) whether the right was clearly established. *Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016). A right is "clearly established" if a "reasonable official would have understood that what he was doing violates that right." *Id*. at 887. This Court may address the two-pronged qualified immunity inquiry in either order, *see Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016), so long as it "facilitate[s] the fair and efficient disposition" of the case, *Putman v. Harris*, 66 F.4th 181, 186 (4th Cir. 2023) (internal quotation marks omitted).

With respect to Blair's two claims related to the upbringing of S.B. and familial privacy, and her familial privacy claim that she brings on behalf of S.B., we find all claims fail even at this stage. Blair alleged that she had a fundamental right to be notified of S.B.'s gender preferences and Dr. Bennett, Olsen and Via's failure to notify her of such preferences violated her and S.B.'s fundamental rights. But under the facts alleged here, none support a finding that these rights are clearly established under the law. Accordingly, the district court properly dismissed her claims.

16

V.

For the foregoing reasons, we remand the district court's ruling with respect to Blair's deliberate indifference claim and affirm the district court's ruling with respect to all other claims.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

WILKINSON, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the district court properly dismissed Blair's *Monell* and substantive due process claims. Unlike my good colleagues, I think the district court was right to dismiss her Title IX claim as well.

In cases of student-on-student sexual harassment, a Title IX plaintiff must show that the funding recipient was aware of the harassment and acted with "deliberate indifference" toward it. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). The *Davis* Court stressed that deliberate indifference occurs "only where the recipient's response to harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* Importantly, "a school's actions do not become 'clearly unreasonable' simply because a victim or h[er] parents advocated for stronger remedial measures." *S.B. ex rel. A.L. v. Bd. of Educ. of Hartford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016) (citation omitted). To hold otherwise would allow the endless daily interactions of teens in school to set the table for Title IX claims.

Too often the Supreme Court attempts to set restrictions on a claim, only to watch the lower federal courts push past the boundaries. The record here hardly indicates "deliberate indifference" by the school employees. After S.B reported being harassed on the bus, both counselor Olsen and the assistant principal reviewed the bus footage. J.A. 52. Olsen also interviewed students who were on the bus and called Blair, S.B.'s adoptive mother, so that S.B. could be picked up from school. J.A. 53. When the parents of other students reported incidents in the boys' bathroom, Olsen and another counselor met with S.B. to talk about what had happened. J.A. 54–55. They agreed that S.B. should use the

18

nurse's restroom from then on. J.A. 55. Olsen and the school resource officer took the additional step of reviewing video footage from outside the bathroom to assess safety concerns. J.A. 55. They too discussed the bus incidents with S.B. J.A. 56.

None of these actions suggest a "decision to remain idle" or to "less than fully engage[]" with S.B.'s allegations. *S.B. ex rel. A.L.*, 819 F.3d at 77 (quoting *Davis*, 526 U.S. at 641). That S.B. was experiencing problems of identity is much to be regretted, but all the uncertainty surrounding this parent-student-teacher triangle presented a situation which Solomon himself would be hard pressed to resolve. That the school employees could have taken additional steps, or different ones, is beside the point. Given what they knew about what was happening, the school employees' actions were not unreasonable—much less clearly so. It is odd to hold, as the majority does, that action amounts to indifference. The terms are plainly irreconcilable, as the district court quickly grasped. J.A. 135.

*Davis* set a "high bar" for Title IX claims premised on peer harassment. *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 268 (4th Cir. 2021); *see also S.B. ex rel. A.L.*, 819 F.3d at 76. And rightly so. Title IX was never meant to put courts in the business of second-guessing every decision made by school administrators in responding to sexual harassment allegations. *See Davis*, 526 U.S. at 648; *S.B. ex rel. A.L.*, 819 F.3d at 77. In reversing the dismissal of Blair's Title IX claim, the majority does just that.